William D. Holm, Bar #007412
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Telephone:  (602) 263-1700
Fax:  (602) 200-7804
wholm@jshfirm.com
cgolightly@jshfirm.com

Attorneys for Defendants Riley & Brian Palmer; Tamara & Joseph Ochoa; Steffani Brown; and South Hill Designs Corp.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Origami Owl, LLC,<br><br>　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>Riley Palmer and Brian Palmer, wife and husband; Tamara Ochoa and Joseph Ochoa, wife and husband; Steffani Brown and John Doe Brown, wife and husband; South Hill Design Corp., an Arizona Corporation,<br><br>　　　　　　　　　　　Defendants. | NO. 2:12-cv-02290-SRB<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH NOTICE** |

Defendants, Riley & Brian Palmer, Tamara & Joseph Ochoa, Seffani Brown, and South Hill Designs Corp. ("South Hill") (collectively, "SHD Defendants"), hereby submit their Memorandum of Law in Opposition to Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction.

**I.　　INTRODUCTION**

In this case, Plaintiff Origami Owl, LLC ("Plaintiff") requests an order restricting South Hill from conducting its jewelry business based on unconvincing theories of copyright infringement, unfair competition, and breach of contract.  A review of the facts in this case, however, suggests that Plaintiff's lawsuit is simply an attempt to suppress fair competition in the marketplace.  Ultimately, Plaintiff is not entitled to a

3003766.1

temporary restraining order because: (1) Plaintiff is not likely to succeed on the merits; (2) Plaintiff is not likely to suffer irreparable harm; (3) a balancing of hardships does not favor injunctive relief; and (4) public policy does not favor injunctive relief, in this case.

## II.   FACTUAL BACKGROUND

### A.   Floating Charm Lockets

For several years, jewelry companies across the Nation have been offering the same type of product the Plaintiff claims it invented (floating-charm lockets). Indeed, a simple internet search reveals that the idea of a locket with floating charms has been used by several other jewelry companies, all formed long before Plaintiff. **[Exhibit A – Floating Locket Competitors]** To the extent Plaintiff claims that this sort of jewelry is unique to Plaintiff, such an allegation would be untrue.

To be sure, Plaintiff's founder, Isabella Weems, could not possibly have "invented" the idea of a floating-charm locket. Upon information and belief, when Ms. Weems first began selling her floating-charm lockets at mall kiosks, she ordered her inventory (charms, lockets, chains, etc.) from wholesalers/retailers which were already selling the lockets and floating charms. She did not originally manufacture, create, or invent these products. They already existed.

Similarly, Plaintiff's direct-sales business model is also not a new idea. Essentially, Plaintiff uses "Independent Designers" to host "Tupperware Parties," but for personalized jewelry. The direct-sales approach is used for all sorts of products, like tupperware, candles, scents, clothing, accessories, purses, make-up, and of course jewelry. More importantly, Plaintiff was not the first company to use the direct-sales approach for selling floating-charm lockets. **[Exhibit A]**

### B.   South Hill Designs

Earlier this year, mother and homemaker, Tamara Ochoa, wanted to start her own jewelry company. She had previously been successful in the direct-sales world and reached out to her husband, Joseph Ochoa, and his friend, Brian Palmer, in the hopes of forming a direct sales jewelry company. Brian and Joseph took the idea and ran with it.

They explored a multitude of personalized jewelry concepts and ultimately landed on floating-charm lockets. Brian and Joseph believed that, with the right business model, there was an opportunity to succeed in the marketplace. With that idea in mind, Brian and Joseph sought to create a distinctive new company that offered personalized floating-charm lockets. With the help of several investors, they formed South Hill, hired a consultant, met with wholesalers/retailers/manufacturers, signed a lease, purchased new equipment, hired employees, purchased inventory (lockets, chains, coins, charms, droplets), and spent approximately $150,000 to start the new business.

On October 18, 2012, South Hill's website went live and they opened for business. Exactly one week later, on October 25, 2012, without notice or warning, Plaintiff hand-delivered a copy of a complaint and an application for temporary restraining order/permanent injunction. In its legal memorandum, Plaintiff alleged the SHD Defendants will begin pirating Plaintiff's customers if not enjoined. Plaintiff further alleged that an injunction is necessary to prevent the SHD Defendants from causing further irreparable harm. At that point in time, South Hill had sold a total of approximately $1,800 in merchandise, all to family and friends through South Hill's website.

Like other direct-sales business models, South Hill uses a network of artists to host jewelry parties at which the final product (the floating-charm locket) is actually created and purchased by customers. The South Hill "Artist" stocks up on inventory prior to the party through South Hill's website. A South Hill Party is advertised and marketed as a **South Hill** Party. At the party, there is no confusion. South Hill provides its artists with various marketing material, including South Hill shopping bags, South Hill locket holders, South Hill stickers, South Hill business cards, South Hill pamphlets, a South Hill charm case, etc. Even the charms used by South Hill Artists have "South Hill Designs" stamped on the back. Everything that is used at a South Hill Party is clearly identified by South Hill branding. In no way could there be any confusion between a South Hill Party and one of Plaintiff's parties.

### C. Alleged Copyrights

Plaintiff claims that the SHD Defendants are infringing on some/all of Plaintiff's forty-plus "registered" copyrights for charm designs. Based on a review of the U.S. Copyright Office's records, however, it is clear that Plaintiff does not have any "registered" copyrights. **[Exhibit B – Public Catalog Search Results for "Origami Owl, LLC"]** Indeed, as Plaintiff's counsel has provided this Court, Plaintiff has only "applied" for registrations on its 42 alleged charm designs. **[Exhibit C – Plaintiff's Copyright Applications]** To date, the U.S. Copyright Office has not issued a determination on Plaintiff's applications. Notwithstanding, Plaintiff improperly alleged in its Complaint that it is the owner of "registered" copyrights on over 40 charm designs.

In addition, Plaintiff claims that the SHD Defendants are infringing on some/all of the 42 charm designs. However, a comparison of Plaintiff's claimed designs with South Hill's charms suggests otherwise. **[Exhibit D – Charm Comparisons]** Although some of the charms are undoubtedly the same *type* of charm (i.e., Football, Cross, American Flag, Dog Bone, Flip Flops, etc.) there can be no mistake that Plaintiff's charms simply look different than South Hill's charms. **[Exhibit D]**

Additionally, it is unlikely that Plaintiff is entitled to a copyright on any of its charm designs. As this Court can see from a quick internet search, each of Plaintiff's charm designs can be found for sale from several other third-party vendors. **[Exhibit D; Exhibit E – Third-Party Wholesalers of Charms]** Plaintiff's so-called "original charm designs" lack the originality and creativity necessary for copyright protection. **[Exhibit D; Exhibit E]**

### D. Riley Palmer – Plaintiff's Independent Designers

Defendant Riley Palmer is a former Independent Designer for Plaintiff. She became an Independent Designer for Plaintiff on or about February 24, 2012. Riley believes that when she signed up to become an Independent Designer for Plaintiff, she agreed to the one-page Designer Agreement attached as Exhibit F. **[Exhibit F – Designer Agreement]** Exhibit F, however, is different from the alleged Designer Agreement

attached to Plaintiff's Complaint.  **[Exhibit 3 to Plaintiff's Complaint]**  More importantly, Riley never agreed to the alleged Origami Owl, LLC Policies & Procedures attached to Plaintiff's Complaint.  In fact, upon information and belief, the Policies & Procedures were not in existence when she originally signed up in February 2012.  Riley was never even provided the Policies & Procedures until she gave notice of her decision to cancel her contract with Plaintiff.  Plaintiff then informed her that before she could cancel, she would need to sign the updated Policies & Procedures agreement (which she also never signed/agreed to before).  **[Exhibit G – Email between Riley Palmer and Plaintiff's Designer Care]**  Ultimately, Riley never signed the Policies & Procedures.  As a result, Plaintiff delayed Riley's cancellation for several months.

The only applicable agreement between Riley and Plaintiff is the agreement attached as Exhibit F.  Pursuant to that Designer Agreement, there is no non-compete or non-solicitation agreement applicable to Riley.  Although Riley and South Hill will obviously compete with Plaintiff, they do not directly or indirectly solicit Plaintiff's Independent Designers.  The SHD Defendants do not even have a list of Plaintiff's Independent Designers to solicit.  Nevertheless, upon information and belief, South Hill believes that some of Plaintiff's current Independent Designers have inquired about joining South Hill due to their unhappiness with Plaintiff's failures.  In fact, it is believed that Plaintiff has a waiting list of prospective Independent Designers of approximately 2,000 individuals.  Despite this fact, South Hill and Riley have not attempted to solicit any of Plaintiff's current or prospective Independent Designers.

Plaintiff also suggests Riley became an Independent Designer for the ulterior purpose of stealing Plaintiff's business methods and proprietary information.  That is absolutely false.  Riley was very excited to join Plaintiff's team and marketed her new position with Plaintiff's team to her family and friends using social media.  Plaintiff admits this fact in its Complaint. Riley created her own Facebook page called, "Origami Owl Riley Palmer Independent Designer."  On that page, she enthusiastically promoted Plaintiff's product.  Unfortunately, shortly after becoming an Independent Designer for

3003766.1                                        5

Plaintiff, Riley began experiencing difficulties with Plaintiff's inventory and customer service. On April 17, 2012, Riley explained her frustration to her superior:

> Tami,
>
> Hi sweetie,
>
> I don't know what to do. I am kind of at a loss. I love this product but I don't see how I can work with/for a company like this. My frustration just doesn't feel worth it, mentally and financially. Sorry I am venting to you, I just don't know what else to do. My orders as I am sure many, many are, aren't arriving. The shipping calendar has been changed repeatedly for the order I made on the 3rd. Yesterday for the 3rd time it changed to today and it didn't ship out today. I have a party Thursday evening far on the west side of town. I can't show up to it with the little inventory I have. I can't properly plan and make orders like this. I have 4 more parties before the end of the month and two really big ones in May. I think if these shipments aren't going to work out I am going to pass my inventory to Kim and see if she wants to business. Sorry I think you are amazing and I love love your honest true spirit.... I am just beyond my stress capacity here.

**[Exhibit H – Emails between Riley Palmer and Tami Black]** Riley's superior, Tami Black, echoed Riley's frustration with Plaintiff's inadequate customer service:

> Oh Riley,
>
> I so feel your pain. I am questioning things too. I hang on only for the same reasons as you, because we love the product, but something has got to give and has got to change. I have 2 of the biggest events this weekend and next week and I have 5 rose gold lockets to my name, that's it. If I do not get my orders, I am not sure what I am going to do, it will not be pretty that is all I can say. I want to tell you to hang on, we will get through this, but to be honest, I am not sure they will. I am not confident at all. Is there anything that will change your mind? What if you get plenty of product tomorrow, would that make you happy? I do remember Kristine Stevens saying this at the last meeting and I don't know why it has stuck with me, "this is not medicine that is going to save your life, this is jewelry". For some reason I keep reflecting back to that, however, there are a lot of other things that are on the line, like our personal reputation with our hostesses, our friends, the people we got into the business. Our name is our everything. Riley I hear you loud and clear. I want in my heart to tell you to stay, hang in there. But enough is enough. I don't blame you. I support you. I understand. I forwarded on your email to corporate in hopes it is not the 1,000th one of its kind, but it might very well be.
>
> You are not alone and let me know what you decide.

Tami

**[Exhibit H]**

Ultimately, Riley jumped at the opportunity to start the same type of business (which she loved) but have more control over her own product – without all the issues Plaintiff was having internally. Where Plaintiff failed, Riley and South Hill would not.

### III. LEGAL ARGUMENT

To obtain a preliminary injunction, Plaintiff must establish (1) a strong likelihood of success on the merits, (2) a *probability*[1] that it will suffer irreparable harm in the absence of injunctive relief, (3) that the balance of equities tips sharply in its favor, and (4) that an injunction is in the public interest. *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012). Because Plaintiff cannot establish any of these elements, its application for a temporary restraining order must be denied.

### A. Plaintiff Cannot Establish a Strong Likelihood of Success on the Merits

In its Complaint, Plaintiff alleges claims of (1) willful copyright infringement in violation of 17 U.S.C. § 501, *et seq.* against all Defendants; (2) unfair competition in violation of 15 U.S.C. § 1125(a) against all Defendants; (3) common law unfair competition against all Defendants; (4) civil conspiracy against all Defendants; and (5) breach of contract against Defendant Riley Palmer. Plaintiff is not likely to succeed on the merits on any of these claims.

#### 1. Copyright Infringement – 17 U.S.C. § 101 *et seq.*

Copyright law protects "original works of authorship," including "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5). Copyright protection does not, however, "extend to any idea, procedure, system, method of operation, concept, principle,

---

[1] Plaintiff cites to a case which states that the standard for irreparable harm is "possibility." *Justice v. Nat'l Collegiate Athletic Ass'n*, 577 F.Supp. 356, 363 (D.Ariz. 1983). This standard has since been overruled by the Supreme Court of the United States. *Winter v. Natural Resources Defense Counsel, Inc.*, 555 U.S. 7, 21-22. The applicable standard is in fact a "probability" of irreparable harm. *Id.*

or discovery. 17 U.S.C. § 102(b).  For instance, copyright protection would not extend to Plaintiff's business model (direct sales) or even more generally to Plaintiff's product (floating-charm lockets).  Those are not protectable.  Anyone can enter the marketplace and replicate Plaintiff's business to compete.

Before bringing a cause of action under 17 U.S.C. § 101 *et seq.*, Plaintiff must first obtain registration of the subject copyrights.  17 U.S.C. § 411(a).  Indeed, "no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made . . . ." 17 U.S.C. § 411(a).  "Copyright registration is not a prerequisite to a valid copyright, but it is a prerequisite to a suit based on a copyright." *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1211 (9th Cir. 1998).  In this case, Plaintiff's cause of action for copyright infringement under 17 U.S.C. § 101 *et seq.* is premature.  Plaintiff does not have any "registered" copyrights.  Plaintiff has merely **applied** for copyright registration.  **[Exhibit C]**  The U.S. Copyright Office has not issued a determination on those applications.  Contrary to Plaintiff's *verified* Complaint, Plaintiff does not have any registered copyrights.  **[Exhibit B]**  Accordingly, this claim should be dismissed for lack of standing.  17 U.S.C. § 411(a).

Notwithstanding Plaintiff's lack of standing, to succeed on its copyright infringement claim, Plaintiff must also prove (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. *Funky Films, Inc. v. Time Warner Entertainment Co.*, L.P., 462 F.3d 1072, 1076 (9th Cir.2006).  "To qualify for copyright protection, a work must be original to the author." *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991).  "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.*  "Originality is the indispensable prerequisite for copyrightability." *N. Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir. 1992); *see also Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003) ("Any copyrighted expression must be 'original.'") (citing *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991).

1  "There must be something more than a 'merely trivial' variation, something recognizably
2  the artist's own." *Satava*, 323 F.3d at 810. "[E]xpressions that are standard, stock, or
3  common to a particular matter or medium are not protectable under copyright law." *Id*.

4        In this case, Plaintiff claims to have copyright protection for 42 original
5  charm designs. A review of Plaintiff's claimed charm designs, however, suggests that
6  Plaintiff's designs are neither original nor creative. When compared with designs from
7  several other third-party vendors, Plaintiff's designs appear to be copies and/or slightly
8  different versions of other pre-existing charms. **[Exhibit D]** Without knowing more
9  detail regarding the circumstances under which Plaintiff's claimed charms were designed
10 (i.e., who, when, how, etc.), it is nearly impossible to determine whether Plaintiff's
11 designs are deserving of copyright protection. At this point, it is clear that third-party
12 vendors offer many of the exact same charms Plaintiff claims to hold copyrights for,
13 which of course would be inconsistent with Plaintiff having been the original author of
14 those charms.

15       Furthermore, Plaintiff cannot prove that South Hill's charms infringe on
16 Plaintiff's designs. A thorough comparison of Plaintiff's claimed charms with South
17 Hill's charms reveals that none of the charms are the same. **[Exhibit D]** There is no
18 copying. South Hill's charms (all of which are purchased from third-party wholesalers)
19 are not copies of Plaintiff's designs. All this Court needs to do is examine Exhibit D to
20 see that Plaintiff's claims of infringement are not corroborated by reality. Based on the
21 facts known to date, Plaintiff cannot establish a strong likelihood of success on the merits
22 for its copyright infringement claim.

23       2.    **Unfair Competition – 15 U.S.C. § 1125(a)**
24       In order to succeed on a false designation of origin claim under 15 U.S.C. §
25 1125(a)(1)(A), Plaintiff must prove each of the following elements:

26       (1) defendant uses a designation (any word, term, name, device, or any combination thereof) or false designation of
27       origin;
28       (2) the use was in interstate commerce;

3003766.1      9

>    (3) the use was in connection with goods or services;
>
>    (4) the designation or false designation is likely to cause confusion, mistake, or deception as to (a) the affiliation, connection, or association of defendant with another person, or (b) as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person; and
>
>    (5) plaintiff has been or is likely to be damaged by these acts.

3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.03 [1] [a].

"A likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993), *abrogated on other grounds as recognized in Roe v. Anderson*, 134 F.3d 1400 (9th Cir. 1998) (internal quotation marks and citations omitted). The Ninth Circuit applies the following eight-factor test to assess the likelihood of confusion: (1) strength of the allegedly infringed mark; (2) proximity or relatedness of the goods; (3) similarity of the sight, sound, and meaning of the marks; (4) evidence of actual confusion; (5) degree to which the marketing channels converge; (6) type of goods and degree of care consumers are likely to exercise in purchasing them; (7) intent of the defendant in selecting the allegedly infringing mark; and (8) likelihood that the parties will expand their product lines. *Id*. "Because each factor is not necessarily relevant to every case, this list functions as a guide and is neither exhaustive nor exclusive." *Id*. (internal quotation marks and citation omitted).

In this case, there is no risk of confusion. South Hill does not use any word, term, name, or device to suggest that its product is really Plaintiff's product. In contrast, South Hill goes to great lengths to distinguish itself from Plaintiff. First, the name "South Hill Designs" is strikingly different from "Origami Owl." There can be no confusion there. Second, South Hill's website, www.southhilldesigns.com, is also very different from Plaintiff's website, www.origamiowl.com. Anyone visiting these websites can easily tell the difference. Indeed, prospective designers/artists/customers will not be

1  fooled into thinking that South Hill is actually Origami Owl. Lastly, South Hill parties are
2  distinct from Plaintiff's parties. South Hill uses extensive marketing material specifically
3  fostering the South Hill brand. For instance, South Hill provides its artists with South Hill
4  shopping bags, South Hill locket holders, South Hill stickers, South Hill business cards,
5  South Hill pamphlets, a South Hill charm case, etc. Everything is branded with South
6  Hill's name, not Plaintiff's. Even the charms used by South Hill Artists have "South Hill
7  Designs" stamped on the back. Everything that is used at a South Hill Party is clearly
8  identified by South Hill branding.
9        Ultimately, South Hill is not attempting to confuse customers as to the
10 identity of its products. There is no evidence that South Hill is trying to make the public
11 believe that its products are actually made by Plaintiff. Plaintiff's cause of action for
12 unfair competition under 15 U.S.C. § 1125 is baseless, unsupported by any facts, and will
13 certainly fail.

      3.    **Common Law Unfair Competition**

15       The common law doctrine of unfair competition is based on principles of
16 equity, and its purpose is "to prevent business conduct that is 'contrary to honest practice
17 in industrial or commercial matters.'" *Fairway Constructors, Inc. v. Ahern*, 193 Ariz.
18 122, 124, 970 P.2d 954, 956 (App. 1998) (quoting *American Heritage Life Ins. Co. v.*
19 *Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir.1974)). Under the Restatement (Third) of
20 Unfair Competition § 1 (1995), one may be held liable for unfair competition for harm
21 resulting from any of the following: (1) deceptive marketing or "passing off"; (2)
22 copyright infringement; or (3) misappropriation of trade secrets.
23       It is important to note, however, that the law clearly recognizes the right to
24 compete, fairly:

> The freedom to engage in business and to compete for the
> patronage of prospective customers is a fundamental premise
> of the free enterprise system. Competition in the marketing of
> goods and services creates incentives to offer quality products
> at reasonable prices and fosters the general welfare by
> promoting the efficient allocation of economic resources. The
> freedom to compete necessarily contemplates the probability

3003766.1                                11

> of harm to the commercial relations of other participants in the market. The fundamental rule stated in the introductory clause of this Section promotes competition by insuring that neither new entrants nor existing competitors will be subject to liability for harm resulting solely from the fact of their participation in the market.
>
> The freedom to compete implies a right to induce prospective customers to do business with the actor rather than with the actor's competitors. This Section permits a seller to seek to divert business not only from competitors generally, but also from a particular competitor.

Restatement (Third) of Unfair Competition § 1 (1995), Comment a.

The doctrine of unfair competition encompasses several tort theories, such as trademark infringement, false advertising, "palming off," and misappropriation. *Fairway Constructors*, 193 Ariz. at 124, 970 P.2d at 956 (citing W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 130 at 1013-30 (5th ed.1984). Copyright preempts some of the claims included in the term "unfair competition."[2] *Fairway Constructors*, 193 Ariz. at 124, 970 P.2d at 956.

"[T]he central tort in unfair competition at common law is known as 'palming off,' or 'passing off.' It consists in a false representation tending to induce buyers to believe that the defendant's product is that of the plaintiff, usually but not always because the plaintiff's product is better known or has a better reputation." Keeton, supra, at 1015; *see also Fairway Constructors*, 193 Ariz. at 124, 970 P.2d at 956; *Kaibab Shop v. Desert Son, Inc.*, 135 Ariz. 487, 488 n.1, 662 P.2d 452, 453 n.1 (App. 1982) ("Palming off" is an attempt to make the purchaser believe that the product of the subsequent entrant is that of his better known competitor."). As explained above, South

---

[2] For instance, federal copyright law preempts common law unfair competition claims related to misappropriation (copying) of copyrighted material. *Fairway Constructors*, 193 Ariz. at 125, 970 P.2d at 957; *See Warner Bros. v. American Broadcasting Cos.*, 720 F.2d 231, 247 (2d Cir. 1983) (holding that "state law claims that rely on the misappropriation branch of unfair competition are preempted"); *see also Durham Ind., Inc. v. Tomy Corp.*, 630 F.2d 905, 918-19 (2d Cir.1980) (finding preemption where claim sought protection against copying); *Balboa Ins. Co. v. Trans Global Equities*, 267 Cal.Rptr. 787, 803 (1990) (finding preemption where misappropriation claim added no element other than those asserted in copyright infringement claim); *Ippolito v. Ono-Lennon*, 526 N.Y.S.2d 877, 883 (Sup.1988) (holding that misappropriation claims are preempted).

3003766.1                                12

Hill has not attempted to confuse the public into thinking that South Hill's products are really Plaintiff's. There is no confusion. Although the products may be similar, there is no ban on competing within the same market. In fact, public policy promotes such competition (to produce better quality at lower prices). As a result, Plaintiff cannot establish unfair competition under a theory of "passing off."

The second form of unfair competition is based on the infringement of intellectual property, such as copyright. Restatement (Third) of Unfair Competition § 1 (1995). This form of unfair competition, however, is preempted by federal copyright law. *Fairway Constructors*, 193 Ariz. at 125, 970 P.2d at 957. Accordingly, Plaintiff cannot establish unfair competition under this theory as well.

Lastly, the third form of unfair competition is based on the misappropriation of a trade secret. Restatement (Third) of Unfair Competition § 1 (1995). In this case, Plaintiff alleges that South Hill and Riley abused Riley's position of trust with Plaintiff to obtain an unlawful business advantage. It is unclear what conduct Plaintiff claims meets the definition of "unlawful," but it appears that Plaintiff merely objects to Riley and South Hill competing in the same market (floating-charm lockets). But it is not unlawful to compete. Riley and South Hill have not stolen any trade secrets (i.e., customer lists, product secrets, or designer lists). Although South Hill competes directly with Plaintiff for customers and designers/artists, South Hill does so fairly, as it is entitled to do under the law. Restatement (Third) of Unfair Competition § 1 (1995), Comment a. Plaintiff's baseless allegation of unfair competition will fail.

### 4. **Civil Conspiracy**

"For a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 498, 38 P.3d 12, 36 (2002) (citations

omitted); *see also* Restatement (Second) of Torts § 876.[3]  A mere agreement to do a wrong imposes no liability—the plaintiff must demonstrate an agreement plus a wrongful act to hold the defendant liable. *Id*. "In short, liability for civil conspiracy requires that two or more individuals agree and thereupon accomplish an underlying tort which the alleged conspirators agreed to commit." *Id*. (internal quotation marks and citations omitted). In this case, there is no conspiracy. The SHD Defendants have never conspired to commit any tort against Plaintiff. Plaintiff alleges no evidence of a conspiracy, because there is none. Plaintiff's civil conspiracy claim will also fail.

### 5. **Breach of Contract – Against Riley Palmer**

"[F]or an enforceable contract to exist there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained." *Savoca Masonry Co., Inc. v. Homes & Son Const. Co., Inc.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975). In this case, Plaintiff attached two separate documents to its Complaint, claiming Riley agreed to both. **[Exhibits 2-3 to Plaintiff's Complaint]** In reality, Riley did not agree to either document. When Riley first joined Plaintiff's company, she agreed to the Designer Agreement attached here as Exhibit F. Riley never agreed to Plaintiff's Policies & Procedures agreement, despite Plaintiff's request for her to do so *after* she gave notice of cancellation.

---

[3] This section provides:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979).

Riley never agreed to a non-competition or non-solicitation provision when she signed up with Plaintiff's company.  Plaintiff's attempt to back-door in a completely separate Policies & Procedures agreement is disingenuous at best.  Based on the only applicable agreement between Riley and Plaintiff, Plaintiff cannot establish a breach of contract.  The only related provision in the applicable Designer Agreement is from Section 14, which governs the use of Plaintiff's trademarks, service marks, copyrights and intellectual property.  **[Exhibit F]**  Under this provision, Riley agreed that "[t]he use of such marks and materials . . . must be at all times in compliance with Origami Owl guidelines.  Upon termination of agreement, all such use must cease immediately."  **[Exhibit F]**  Riley has complied with this provision.  There was no breach and Plaintiff does not have any evidence to establish a breach.

### B.     Irreparable Harm

Assuming Plaintiff can prove a strong likelihood of success on the merits, Plaintiff must also prove a ***probability*** that it will suffer irreparable harm in the absence of injunctive relief.  *W. Watersheds Project*, 692 F.3d at 923.  A plaintiff in a copyright infringement case is no longer granted the presumption of irreparable harm upon a showing of likelihood of success on the merits.  Instead, a plaintiff seeking a preliminary injunction must establish that it is ***likely*** to suffer irreparable harm in the absence of preliminary relief.  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) (citations omitted).  In *Winter*, the Supreme Court held that a plaintiff must demonstrate that irreparable injury is "***likely*** in the absence of an injunction," rejecting the Ninth Circuit's approach of applying a "possibility" of irreparable harm standard when a plaintiff demonstrates a strong likelihood of prevailing on the merits.  *Id*. at 21 (emphasis added).  The Court remarked that "[i]ssuing a preliminary injunction based only a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an ***extraordinary*** remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id*. at 22 (emphasis added).

In this case, Plaintiff claims that it will sustain irreparable harm to its

goodwill and value in its products. This argument goes back to Plaintiff's claims relating to "passing off." Plaintiff cannot show that any customer confusion exists. South Hill is not attempting to confuse the public into believing that its products are really Plaintiff's products. As a result, Plaintiff's goodwill is not in jeopardy. Nevertheless, Plaintiff also claims that there is a threat that Plaintiff's customers and Independent Designers will be wrongfully stolen. Plaintiff, of course, fails to inform this Court that it currently has approximately 2,000 prospective Independent Designers on a waitlist. It does not appear that Plaintiff will be "irreparably" harmed if some of those prospective designers ultimately join South Hill instead of Plaintiff's company.[4] More importantly, such competition is not only legal, but favored by public policy. Plaintiff cannot show irreparable harm.

### C. The Balance of Equities

Next, Plaintiff must prove that the balance of equities tips sharply in its favor. *W. Watersheds Project*, 692 F.3d at 923. Here, Plaintiff offers no analysis of the competing hardships. Plaintiff merely claims that the equities tip in its favor, with no explanation. In reality, the balance of hardships tip heavily in the SHD Defendants' favor. As explained above, South Hill is start-up company. Injunctive relief would be fatal. The SHD Defendants have already spent approximately $150,000 to form South Hill, hire a consultant, meet with wholesalers/retailers/manufacturers, sign a lease, purchase new equipment, hire employees, and purchase inventory (lockets, chains, coins, charms, droplets). The SHD Defendants have also poured several hundred hours of sweat equity into South Hill. South Hill is a struggling start-up company. It has been doing business for just over two weeks, selling mostly to family and friends. In that time, South Hill's sales amounted to a mere $5,000. Injunctive relief at this early stage in the company would be incurable. In contrast, Plaintiff does not face such extreme hardship. Plaintiff is a well-established company. It has sales numbers in the millions and nearly 2,000

---

[4] Moreover, Plaintiff has not even suggested that damages could remedy the harm it has allegedly sustained.

designers waiting to sign up.  The balance of equities tips sharply in favor of the SHD Defendants.

### D. Public Interest Does not Favor Injunctive Relief

Lastly, Plaintiff must prove that an injunction is in the public interest. *W. Watersheds Project*, 692 F.3d at 923.  Plaintiff claims that if injunctive relief is not granted, the purpose of federal copyright protection will be thwarted.  In this case, however, there is no copyright infringement.  Plaintiff's entire lawsuit is simply an attempt to shut down a small start-up company by alleging unsubstantiated claims.  Plaintiff's lawsuit is a misguided endeavor to stifle competition in violation of the clear public policy favoring such competition (i.e., to increase the quality of goods and decrease prices).  Accordingly, public interest does not favor an injunction in this case.

## IV. CONCLUSION

For the reasons stated above, the SHD Defendants respectfully request that this Court deny Plaintiff's application for a temporary restraining order.

DATED this 6th day of November, 2012.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ William D. Holm
   William D. Holm
   2901 North Central Avenue, Suite 800
   Phoenix, Arizona  85012
   Attorneys for Defendants Riley & Brian
   Palmer; Tamara & Joseph Ochoa; Steffani
   Brown; and South Hill Design Corp.

ORIGINAL electronically E-filed
this 6th day of November, 2012.

COPY mailed/e-mailed
this 6th day of November, 2012, to:

Leon B. Silver
Rebecca N. Lumley
Polsinelli Shughart, PC
One East Washington Street, Suite 1200
Phoenix, Arizona  85004
Attorneys for Plaintiff

/s/ Vicki Jones

3003766.1                                              18